Daniel DiCicco, OSB # 073730
205 SE Spokane St Suite 300
Portland OR 97202
v: 503.967.3996
e: dan@diciccolegal.com
Attorney for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

| | |
|---|---|
| **NEIL PATEL, NIRAV PATEL, and RN2 ENTERPRISES LLC** | Case No. 1:19-cv-2037 |
| Plaintiffs, | |
| v. | **COMPLAINT FOR FRAUD, CONVERSION, UNLAWFUL TRADE PRACTICES, AND BREACH OF CONTRACT** |
| **ROBBIE LESA HORTON, JAMES HORTON, NICHOLAS DEL FRANCO, BIG BOOTS LLC, HEMP WAREHOUSE LLC, and BRANDON ROSS STRAUSS** | **$1,000,000 DAMAGES SOUGHT** |
| Defendants, | **DEMAND FOR JURY TRIAL** |

**1.**

**PRELIMINARY STATEMENT**

This is an action for fraud, conversion, breach of contract, and unlawful trade practices seeking damages and replevin.  Plaintiff RN2 Enterprises LLC is a New York limited liability company that came to Oregon seeking investment opportunities in the

industrial hemp extraction sector; Plaintiffs Neil Patel and Nirav Patel are the owners of RN2 Enterprises.  Defendants Lesa Horton, James Horton, Nick Del Franco, and Brandon Strauss are Oregon residents who operate various business entities in the industrial hemp extraction sector.  Plaintiff and defendants connected through a trade organization and met with the defendants to discuss investment opportunities.

Operating under the guise of the business entity Big Boots LLC, the defendants L. Horton, Del Franco, and Strauss represented to Plaintiffs that they owned an established industrial hemp extraction business complete with production equipment, existing revenue-generating contracts, warehousing space, and other infrastructure necessary to ply their trade.  Based upon the representations of the defendants, Plaintiff invested more than $600,000 into a supposed partnership with the defendants only to later learn that none of the defendants' representations were remotely true: they had no equipment, no contracts, no infrastructure of any kind.

Defendants instead have converted the $600,000 worth of industrial hemp extraction equipment and investment capital provided by Plaintiffs to their own uses. The equipment is unaccounted for, the cash is unaccounted for, and defendants have ceased civil communication with Plaintiff, including making explicit violent and homicidal threats.  Plaintiff seeks now to recover its capital and equipment from the defendants.

**2.**

**JURISDICTION**

This court has jurisdiction because this action is brought based on Oregon statutes and common law, and the acts and omissions giving rise to this suit originated in Oregon.  Plaintiff is a New York Limited Liability Company and defendants are all citizens of Oregon in their individual and business capacities, giving rise to diversity jurisdiction.  The amount in controversy is greater than $75,000.

## 3.

## VENUE

Venue is appropriate in the District of Oregon Medford Division because the majority of the fraudulent activity occurred in this District, and it is likely that the missing equipment and capital can be recovered in this district.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

## 4.

Plaintiff is a New York Limited Liability Company operated by Neil Patel and Nirav Patel. Neil Patel is a resident of New York and Nirav Patel is a resident of New Jersey.

## 5.

Defendant Robbie Lesa Horton (a.k.a. Lesa Horton) is an individual and a resident of Selma, Oregon.  Defendant James Horton is an individual and a resident of Selma, Oregon.  Defendant Brandon Ross Strauss is an individual and a resident of Cave Junction, Oregon.  Defendant Big Boots LLC is an Oregon LLC owned by Lesa Horton and James Horton.  Defendant Nicholas Del Franco is an individual with an unknown

connection to Big Boots LLC; his father, Thomas Douglas Del Franco, is listed as an Organizer of Big Boots LLC on the business registration filed with the Oregon Secretary of State.  Defendant Hemp Warehouse LLC is an Oregon LLC owned by Lesa Horton and James Horton.

**6.**

In March of 2019, after having connected through the Hemp Association of Southern Oregon, Defendants Horton, Del Franco, and Ross presented a business proposal to Plaintiff entitled "Hemp Extraction Business Proposal" (the "**proposal**").  This proposal is attached as **Exhibit A.**

**7.**

The defendants represented orally and via the proposal that they owned and operated an established industrial hemp extraction business with extensive assets, including several hundred thousand dollars of processing equipment and contracts to process more than two million pounds of industrial hemp per month.  The defendants promised lavish returns on investor capital, and represented that they needed immediate investment to expand their operations.

**8.**

The defendants represented to Plaintiff that time was of the essence in securing investment capital because the harvest season was rapidly approaching and the

business had certain immediate needs to meet if it was going to be able to fill its various contracts to process the two million pounds of industrial hemp per month.

### 9.

Plaintiff Nirav Patel flew to Oregon around March 15, 2019, to meet the Defendants in person and to inspect the production facilities.  Plaintiff visited Defendant's current production facilities but did not see any of the expected equipment; Defendants Strauss and Del Franco showed Plaintiff a video that purported to show the equipment in storage at a secure facility.

### 10.

Relying on these representations, Plaintiff agreed to go into business with the Defendants, and executed a promissory note hele by defendant Big Boots LLC for $151,113.50.  This loan was specifically granted to acquire processing equipment that would be needed for extraction.  The collateral for the note was the hemp product and bi-product currently owned by Big Boots LLC.  The promissory note is attached as **Exhibit B.**

### 11.

Unbeknownst to Plaintiff, the defendants did not possess any of the hemp product or bi-product it pledged as collateral, nor did the defendants own any of the equipment they said they owned, nor did they have any contracts to process industrial hemp.  All of the representations in the proposal were complete fabrications.

**12.**

In April of 2019, Plaintiff and Defendant Horton created Qualis Labs LLC, an Oregon limited liability company, with the goal of running extraction operations through this entity.  Plaintiff created an operating agreement but the individual defendants refused to sign it.  The parties nevertheless continued to develop their business while negotiations continued on the operating agreement.

**13.**

Plaintiff purchased machinery, production facilities, professional services, and supplies to prepare for the expected production efforts, including:

a.  One (1) YMD-5S-2 Stainless Steel Short Path Molecular Distillation machine valued at $148,000, purchased on March 29, 2019

b.  Eight (8) 50L Rotary Evaporator ("rotovap") machines valued at $77,426 in total, purchased on March 29, 2019

c.  $15,018 for architectural design plans from April to August 2019

d.  One (1) hemp grinding machine, purchased on June 3rd 2019, for $9,800

e.  On June 13 and June 14, 2019, $18,770 was paid to PSI LLC and $11,644 was paid to Nemko USA, respectively, for engineering and certification services

f.  $17,500 total to rent an extraction facility site in Cave Junction, Oregon

g.  $75,000 total towards a lease-to-own agreement for an extraction facility site located in White City, Oregon from April through July of 2019.

h.  $25,638 for a down payment on a 600L Reactor and 6000L Extractor (machinery) on June 20, 2019.

i.  Approximately $115,000 was spent on various activities including contract labor, supplies and materials, professional services, utilities, and travel from April through August 2019

**14.**

In May of 2019, after investing heavily in machinery and production facilities as tabulated above, Plaintiffs expected that production would have begun on the various extraction contracts the defendants purported to have.  The defendants could not demonstrate any operational progress.

**15.**

Plaintiffs quickly became suspicious when the defendants continually failed to show any revenue and to produce any final products, and they became ever more insistent on setting production goals and on having visibility into the extraction operations.  Instead of producing results, over the course of the spring and summer of 2019, the defendants threatened on multiple occasions to stop production entirely unless Plaintiffs paid money to them.  Under duress, Plaintiff made the following "good will" payments to defendants Strauss and Lesa Horton:

a.  On May 9th 2019: 100,000

b.  On May 22nd 2019: $50,000

c.  On June 13th 2019: $50,000

**16.**

Plaintiffs persisted in attempting to formalize the business arrangement with Defendants, who refused at all points to be pinned down into any one agreement.  The Defendant always seemed to want to new terms, more money, and less oversight. When Plaintiff asked Defendant Strauss to come to some final position, Strauss threatened physical harm to Plaintiff Neil Patel.  See the text messages attached as **Exhibit C.**

**17.**

In October 2019, Plaintiff Neil Patel visited Oregon to inspect the production facilities located in White City, Oregon to try and understand what the Defendants were doing with their money and equipment.  Patel discovered an entirely different hemp extraction business operating out of the White City production facility called Hemp Warehouse LLC, a company owned entirely by Defendant Horton.   None of Plaintiff's equipment was located at that site. Patel discovered from workers at the White City facility that they were not aware of Patel's group.

**18.**

Patel also spoke to Brandon Strauss in his visit to Oregon in October of 2019, and discovered that Strauss had taken some of Plaintiff's equipment to Salem, Oregon to start a new extraction business.  Strauss refused to turn over the equipment and ceased communications with Plaintiff thereafter.

**19.**

On October 4, 2019, Defendant Horton confirmed that she is in possession of five "rotovap" machines and stated that she would not return them to Plaintiff.

**20.**

The Defendants have not made any payments on the Promissory Note and are in default. The entire amount is now due.

**21.**

The defendants have converted all of the investment capital and equipment to their own personal use.

**FIRST CLAIM FOR RELIEF**

Fraud

**22.**

Previous paragraphs are incorporated by reference. The Defendants individually and as business entities have committed a fraud upon Plaintiffs by intentionally lying to Plaintiff about their industrial hemp extraction capabilities, equipment, contracts, and experience.  By so making those false representations, the Defendants intended to deceive Plaintiff and did so deceive Plaintiff into relying on those representations to

invest money with the Defendants.  Plaintiffs have been damaged by the false representations.

## SECOND CLAIM FOR RELIEF

Unlawful Trade Practices Act ORS 646.608

### 23.

Previous paragraphs are incorporated by reference.  Defendants have willfully violated the Oregon Unlawful Trade Practices Act by engaging in unfair and deceptive conduct in trade or commerce, specifically by lying about their equipment and capabilities as described above and by making threats of physical violence to induce Plaintiffs into paying money to them and into investing further into defendants' fraudulent schemes. But for this unlawful conduct, Plaintiffs would not have entered into any business arrangements with the Defendants, and Plaintiff have been damaged as a result.

## THIRD CLAIM FOR RELIEF

Conversion

### 24.

Previous paragraphs are incorporated by reference. Plaintiff has ownership of and the right to possess the following property that is now in possession of Defendants:

   a.  Eight Rotovap Machines and associated circulating chillers and vacuum
       pumps

   b.  YMD 5S-2 Machine and all associated supporting equipment

   c.  Electric hemp grinding machine

   d.  Any sales proceeds or ownership interest in the White City facility located at

       2125 Ave G, White City, OR  97503

**28.**

The Defendants have converted this equipment by refusing to surrender it on demand,

by using it without authority to so use it, and potentially by disposing of it through

unauthorized sale.

**FOURTH CLAIM FOR RELIEF**

Breach of Contract

**29.**

Previous paragraphs are incorporated by reference.  The Defendants are in breach of

the terms of the promissory note, having made no payments and missed all deadlines.

Plaintiffs have been damaged by Defendant's breach of contract for the principal,

interest, and late fees now owed on the promissory note.

**WHEREFORE,** Plaintiff prays for relief against the defendants as follows:

   a.  An order requiring Defendants jointly and severally to pay damages to
       Plaintiffs in the amount of $1,000,000

   b.  An order issuing a writ of replevin so that Plaintiffs may recover from
       Defendants the equipment it purchased which is now in its possession

    c.  An order requiring Defendants to pay Plaintiff's attorney fees and court costs

    d.  Other relief that the court finds just and equitable

Respectfully Submitted by:

Dated December 16, 2019

*/s/ Daniel DiCicco*
Daniel DiCicco, OSB # 073730
205 SE Spokane St. Suite 300
Portland OR 97202
v: 503.967.3996
e: dan@diccicolegal.com
Attorney for Plaintiff

# HEMP EXTRACTION BUSINESS PROPOSAL

Big Boots, LLC

# Current Inventory of Equipment

| | |
|---|---|
| **60 – 100 kilos an hour wiped film** | **600 liter extractor (65,000 pounds of bio)** |
| **Summit 22 liter short-path** | **13 50 liter roto vaps (10,000 pounds of bio)** |
| **2 22 liter short-paths** | **6,360 liter bbl soaking tank (doubles production)** |
| **Steam falling film (15 pounds of bio)** | **Negative 150 degrees cryo freezer** |
| **8 storage sea trains** | **1,350 liter roto vap** |
| **5 milling machines** | **22 vacuum ovens** |
| **Screw press** | **2 vacuum filters** |
| **500 liter extraction setup (15,000 pounds of bio)** | ***Monthly production of 180,000 pounds of bio*** |

# Executed Monthly Tolling Contracts

- 30,000 lbs. of biomass on a 50/50 split for 12 months
- 20,000 lbs. of biomass on a 50/50 split for 12 months
- 1,000,000 lbs. of biomass on a paid basis ($30/$1.15)

# Projected Monthly Income

- 18,000 liters of crude with a projected sales price of $1,500
- Projected Monthly Income  - $27,000,000 @ 50%
- Projected Monthly Operating Expenses - $5.1 million
- Projected Monthly Net Income - $8.4 million
- Net Income for Investors $8,400,000 * 30% = $2,520,000

- **Projected Annual Income for Investors = $30,240,000**

# Return on Investment

■ Initial Investment - $5,000,000

■ Expected Payback – <3 months

■ Projected Income after 12 months - $30,240,000

■ Rate of Return - $78,840,000/$5,000,000 = 605%

DocuSign Envelope ID: 8F62014930E82-4D43-938C-A10E0DFA9C50
Case 1:19-cv-02037-MC   Document 1   Filed 12/16/19   Page 18 of 25

Exhibit B 1 of 7

### PROMISSORY NOTE

March 29, 2019
$151,113.50

**FOR VALUE RECEIVED**, BIG BOOTS, LLC, an Oregon limited liability company ("Maker"), hereby promises to pay to the order of:

RN2 Enterprises LLC, a New York limited liability company or its order ("Holder"), the principal sum of $151,113.50. All sums of this Promissory Note are payable on or before April 27, 2019. All sums become owing hereon from time to time, all as hereinafter provided and upon the following terms and conditions.

**1.     DEFINITIONS**.  All capitalized terms shall have the meaning ascribed to them herein.

**USE OF PROCEEDS.**  The proceeds of this loan will be used by Maker for operating expenses associated with Maker's business – i.e., an industrial hemp extraction company, Big Boots, LLC, located at 981 Caves Hwy, Cave Junction, OR 97523, and 2125 Ave. G, White City, OR 97503.

**2.     REPAYMENT TERMS.**

**A.     Interest; Maturity Date; Grace Period.**  Interest on the principal of this Promissory Note (this "Note") shall be 0 (0%), and all principal shall be payable on or before April 27, 2019 (the "Maturity Date"). Notwithstanding the immediately preceding sentence ***and anything to the contrary set forth herein***, Maker shall have until June 31, 2019 (the "Grace Period") to pay Holder any amounts due under this Note before Holder exercises any of its remedies set forth in Section 5.B. During the Grace Period, a 2%interest amount of $3,022.27 will be assessed and added to the principal amount due.

**B.     Default Interest.**  In the Event of Default, interest on any unpaid principal and interest shall accrue at the rate of eighteen percent (18%) per annum (the "Default Rate").

**C.     Prepayment.**  This Note may be prepaid, in whole, at any time before the Maturity.

DocuSign Envelope ID: 8F62D143-0E82-4D45-938C-A10E0DFA9C50

**D.      Payment(s).**   All payments hereunder shall be made by certified funds made payable and delivered to Holder at its below address or wired to Holder's account:

> RN2 Enterprises LLC
> 8095 Squirrel Corn Lane
> Manlius, NY 13104
> Chase Bank
> 329 Fayette St, Manlius, NY 13104
> Routing: 021000021
> Account Number: 382997937

or to any other address, person, or bank account as directed by Holder to Maker in a writing signed by Holder and delivered to Maker in accordance with Section 10 below. Any payment made on this Note shall be applied first to interest accrued to date of payment and then to principal.

**3.      DEFAULTS AND REMEDIES.**

**A.      Event of Default.**   An "<u>Event of Default</u>" with respect to this Note occurs if:

   i.    Maker fails to pay the full amount of the payment due under this Note on or before the Maturity Date and the default continues beyond the Grace Period; or

   ii.   (a) the Maker shall commence any case, proceeding or other action (1) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to its debts, or (2) seek appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its assets, or the Maker shall make a general assignment for the benefit of its creditors; or (b) there shall be commenced against the Maker any case, proceeding or other action of a nature referred to in clause (a) above which (1) results in the entry of an order for relief or any such adjudication or appointment or (2) remains undismissed, undercharged or unbonded for a period of sixty (60) days; or (c) there shall be commenced against the Maker any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets which results in the entry of an order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within sixty (60) days from the entry thereof; or (d) the Maker shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (a), (b) or (c) above; or (e) the Maker shall be unable to, or shall admit in writing his inability to, pay his debts as they become due.

**B.      Remedies.**   If an Event of Default occurs then (in addition to any other rights or remedies the Holder may have hereunder), all the amounts outstanding under this Note

shall immediately become due and payable and interest shall accrue at the Default Rate per annum. If an Event of Default occurs and is continuing, the parties may pursue any available remedy by proceeding at law or in equity to collect the payment on this Note or to enforce the performance of any provisions of this Note. A delay or omission by either party in exercising any right or remedy arising upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default. The remedies of Holder as provided herein or in law or in equity shall be cumulative and concurrent, and may be pursued singularly, successively, or together at the sole discretion of the Holder, and may be exercised as often as occasion therefor shall occur; and the failure to exercise any such right or remedy shall in no event be construed as a waiver or a release thereof.

4.      **COLLATERAL.**  Maker, in consideration of the indebtedness described in this Note, hereby grants and conveys to Holder a security interest in and to all of Maker's existing and future right, title and interest in, to, and under its hemp crop or hemp extraction bi-product (and all products and proceeds from the sale or other disposition thereof) and the proceeds of any crop insurance thereon (collectively, the "Collateral"). Notwithstanding the foregoing, the security interest granted herein shall not extend to and the term "Collateral" shall not include any contract right or licenses to the extent that any such contract or license prohibits the granting of a security interest therein, and the granting of a security interest in such contract or license would cause Maker to be in breach thereof or otherwise lose Maker's rights thereunder. This Section 6 is intended, to the extent applicable, to be a security agreement pursuant to the Uniform Commercial Code for any of the items specified above as part of the Collateral which, under applicable law, may be subject to a security interest pursuant to the Uniform Commercial Code of California or any applicable jurisdiction where the Collateral may be located (the "UCC"). Upon the occurrence and during the continuance of an Event of Default, Holder shall have the remedies of a secured party under the UCC and may exercise all rights and remedies available under the UCC and this Note. Holder acknowledges, understands and agrees, however, that Maker may have or may grant a security interest in the Collateral to other parties, and that Holder is not the sole secured lender.

5.      **WAIVER.**

A.      The Maker, endorser(s), and guarantor(s), if any, of this Note and all other persons who may become liable for the payment hereof hereby severally waive diligence, demand, presentment for payment, protest and notice, and agree to all extensions and partial payments, before or after maturity, without notice.

B.      No waiver of any an Event of Default or failure of condition under the terms of this Note shall be implied from any failure of Holder to take, or any delay by Holder in taking, action with respect to any Event of Default or failure of condition, or from any previous waiver.  A waiver of any term in this Note must be made in writing and shall be limited to the express written terms of such waiver.

DocuSign Envelope ID: 8F620143-0E82-4D45-958C-A10E0DFA9C50

**6.    LATE CHARGE.**  Maker acknowledges that late payment to Holder will cause Holder to incur costs not contemplated by this loan. Therefore, if any payment is not made on or before the Maturity Date and the Grace Period, Maker will pay to Holder an additional sum of two percent (2%) of the amount of the overdue amount as a late charge. The parties agree that this late charge represents a reasonable sum considering all circumstances existing on the date hereof and represents a fair and reasonable estimate of the costs that Holder will incur by reason of late payment. The parties further agree that proof of actual damages would be costly or inconvenient. Acceptance of the late charge will not constitute a waiver of that Event of Default with respect to the overdue amount and will not prevent Holder from exercising any of the other rights and remedies available to Holder. Maker's payment will be credited first to late charges due under the terms of this Note, then to interest then due, then to principal.

**7.    REPRESENTATIONS, WARRANTIES AND COVENANTS.**

**A.**    Maker hereby covenants and agrees that it has the authority to execute, deliver and perform this Note, and further, that: (i) this Note was executed in accordance with all requirements of law, and all requirements of the articles of organization or operating agreement of Maker; (ii) no consent, approval, or authorization of any person/entity not a party to this Note is required as a condition to the valid execution, delivery, performance or enforceability of this Note, or any other document executed in connection with this Note; (iii) Maker's execution, delivery, and performance of this Note (a) will not violate any order, writ, judgment or decree of any court, arbitrator or governmental authority to which it is a party or by which it is bound, and (b) will not violate any provision of, or constitute a default under any agreement to which Maker is a party or which is binding upon it; and (iv) this Note is legal, valid, and binding against Maker in accordance with its terms.

**B.**    Maker hereby warrants and declares that this Note is executed and delivered voluntarily, without any duress of any type or nature whatsoever, whether economic or otherwise, or undue influence or misrepresentation by the parties, or any of their agents or attorneys. This Note is supported by contemporaneous, fair, and legally sufficient consideration, shall be binding and enforceable against both the Maker and the Holder and their legal representatives, successors, heirs and permitted assigns, and any other person or entity claiming by or through the undersigned parties.  Notwithstanding the foregoing, the Holder shall not assign this Note or any interest therein to any third party without the express prior written consent of the Maker.

**8.    NOTICES.**  Notices and consents under this Note must be in writing and delivered by mail, hand, fax, or e-mail to the addresses set out herein below or other addresses given by one party to the other in writing. Notices given in the manner will be considered given two business days after deposit in the mail, or the first business day after delivery to a courier, delivery by fax or transmission by e-mail.

**9.    MISCELLANEOUS PROVISIONS.**

DocuSign Envelope ID: 8F62D143-0E82-4D45-998C-A10E0DFA9C50

**A.    Governing Law.**  This Note is made and delivered and shall be construed in accordance with and governed by the internal laws of the State of New York, without giving effect to the conflicts of law principles thereof to the extent the laws of another jurisdiction would be applied. The State and Federal courts situated in Onondaga County, New York, shall have exclusive jurisdiction to resolve any and all disputes with respect to this Note, with each party irrevocably consenting to the jurisdiction thereof for any actions, suits or proceedings arising out of or relating to this Note.

**B.    Maker's Express Waivers.**  It is the parties' intention that this Note comply with usury laws and the Truth in Lending Act (TILA), as applicable. The parties acknowledge, understand, and agree that Holder's loan is being made to a corporate commercial enterprise whereby neither usury laws nor TILA apply and, in any event, Maker covenants (to the extent that it may lawfully do so) that it shall not assert, plead (as a defense or otherwise) or in any manner whatsoever claim (and shall actively resist any attempt to compel it to assert, plead or claim) in any action, suit or proceeding that the interest rate on this Note violates present or future usury, TILA, or other laws relating to the interest payable on any indebtedness hereunder and shall not otherwise avail itself (and shall actively resist any attempt to compel it to avail itself) of the benefits or advantages of any such laws.

**C.    Severability and Enforceability.**  The invalidity of any provision of this Note, as determined by a court of competent jurisdiction, shall in no way affect the validity of any other provision hereof, and in case any provision of this Note shall for any reason be held invalid, illegal or unenforceable in any respect, this Note shall be construed as if such provision had never been contained herein; provided, however, that it shall be construed in such a manner so as to enable both the Maker and the Holder to obtain a practical realization of all benefits contemplated to be acquired by them hereunder.

**D.    General Interpretation.**  Where the context of this Note requires the use herein of the singular number shall be deemed to mean the plural, and the plural number shall be deemed to mean the singular. Any references to gender, whether masculine, feminine or neuter, shall be deemed to mean whichever is appropriate under the circumstances of the usage. The headings contained in this Note are inserted as a matter of convenience and reference only, and shall in no way define, limit, or describe the scope or intent of this Note, or in any way affect the terms and provisions hereof.

**E.    Attorney's Fees / Expenses.**  If an Event of Default occurs in the payment when due of any part or installment of principal or interest, the Maker agrees to pay all costs and collection charges. Should this Note be referred to an attorney or should suit or other action be instituted to collect this Note, or any portion thereof, the undersigned promise to pay, besides costs and disbursements allowed by law, reasonable attorney's fees and in the case of suit or other action, such additional sums and attorney's fees as the Judge of the court may adjudge reasonable in such suit or action.

**F.    Relationship of the Parties.**  Nothing in this Note shall create a partnership, joint venture, employment, or any other relationship between the parties, other than that of borrower and lender.

**G.    Time of Essence.**  Time is of the essence with respect to every provision hereof.

**H.    No Presumption Based on Drafting.**   The parties acknowledge that this Note has been prepared, for the convenience of all parties, by Maker. Holder represents that: (i) it has consulted with or had the opportunity to consult with counsel of its choosing in connection with this Note prior to its execution; (ii) it is not relying in any way upon Maker to protect its interests in connection with the drafting or terms of this Note; and (iii) there shall be no presumption affecting the interpretation of this Note based upon the fact that it was prepared by Maker.

**I.    Counterparts; Facsimile.**  This Note may be executed in counterparts and delivered to each of the parties by electronic transmission. E-signatures, facsimile or photocopy signatures shall be deemed as legally enforceable and is the original. Each such counterpart shall be, and shall be deemed to be, an original instrument, but all such counterparts taken together shall constitute one and the same agreement

**10.    BINDING COMMITMENT; ESCROW; FUNDING INSTRUCTIONS.** Holder acknowledges, understands and agrees that: (a) upon signing this Note it will be legally obligated to loan the principal amount hereunder to Maker; (b) that it will fund the loan within two business days of the date first written above by wire transfer into the below escrow agent's account, unless otherwise stated; (c) that the law firm of Giordano & Heckele, PLLC shall serve as escrow agent for Maker and Holder in respect of this Note; and (d) that Holder will deposit the loan amount into said escrow agent's below IOLTA trust account for its disbursement to Maker and any brokers or other parties entitled thereto, which is hereby approved, and instructed by Holder.

**Holder's Wiring Instructions:**

SEE ATTACHED EXHIBIT A

**IN WITNESS WHEREOF**, the parties executed this Note as of the day and year first above written.

**BIG BOOTS, LLC** ("Maker")

*Lesa Horton*
DocuSigned by:
_____
H2E1AC23DCA344D...
By: Lesa Horton
Its: Managing Member

18247 Redwood Hwy
Selma, Oregon 97538
E-Mail: lesaelmadronal@gmail.com

**BIG BOOTS, LLC** ("Maker")

*Lesa Horton*
DocuSigned by:
_____
H2E1AC23DCA344D...
By: Lesa Horton
Individually
E-Mail: lesaelmadronal@gmail.com

**RN2 Enterprises LLC**
("Holder")

*Neil Patel*
DocuSigned by:
_____
87FE9364241C479...

By: Neil Patel

Its: Member

8095 Squirrel Corn Lane
Manlius, NY 13104

EXHIBIT A

121,088.00    Send to Shanghai Yuanhuan Industrial Co. $121,038 plus $50 wiring fee (will supply instructions)

30,025.50    Pay to Owner of White City $30,000 plus $25.50 overnight check delivery fee (will supply instructions)

TOTAL   151,113.50

